17CV 08720

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17-CVS-

FILED
2017 JUL 17 P 12:41
WAKE CO., C.S.C.
BY

MICHAEL D. OLANDER, JR., individually and derivatively on behalf of Wall Group Industries, Inc., and MDO HOLDINGS, LLC,

Plaintiffs,

v.

FRANK LEE BYRD and WALL GROUP INDUSTRIES, INC.,

Defendants.

**VERIFIED COMPLAINT**

Plaintiffs Michael D. Olander, Jr. and MDO Holdings, LLC complain of Defendants Frank Lee Byrd and Wall Group Industries, Inc. as follows:

## NATURE OF CASE

1. Plaintiff Michael D. Olander, Jr. is a minority shareholder in Wall Group Industries, Inc. Defendant Frank Lee Byrd is the controlling majority owner, sole director, and president of Wall Group Industries, Inc. Byrd breached his fiduciary duties to Olander and Wall Group; embezzled company funds for personal use; and engaged in significant fraud and wrongdoing to Olander and his management company, Plaintiff MDO Holdings, Inc. This action seeks to redress Byrd's wrongdoing.

## PARTIES & JURISDICTION

2. Plaintiff Michael D. Olander, Jr. ("Olander") is an individual who resides in Wake County, North Carolina. Olander is an entrepreneur and is a member of Plaintiff MDO Holdings, LLC.

3. Plaintiff MDO Holdings, LLC ("MDO") is a limited liability company organized and existing under North Carolina law. MDO is registered to do business in North Carolina and has its principal place of business in Wake County, North Carolina.

4. Defendant Frank Lee Byrd ("Byrd") is an individual who resides in Durham County, North Carolina. Byrd is the majority owner, president, and sole director of Defendant Wall Group Industries, Inc.

5. Defendant Wall Group Industries, Inc. ("Wall Group") is a corporation organized and existing under North Carolina law. Wall Group is registered to do business in North Carolina and has its registered address in Wake County, North Carolina.

6. This Court has jurisdiction over the parties pursuant to N.C. Gen. Stat. § 1-75.4 and other applicable statutes.

7. Venue is proper pursuant to N.C. Gen. Stat. § 1-82 and other applicable statutes.

## RELEVANT FACTS

Byrd Solicits Olander to Invest in Wall Group

8. Wall Group is a construction company that focuses on the construction and installation of specialty drywall. Byrd is the founder, president, and sole director of Wall Group. Until mid-2015, Byrd owned one hundred percent of Wall Group's stock.

9. In mid-2015, Byrd and Olander were introduced through a mutual acquaintance. Byrd was looking for an investor in Wall Group to help it grow.

10. Byrd discussed Wall Group and its financial condition with Olander. Byrd represented that Wall Group was profitable and had significant growth potential, including in connection with a number of federal government projects in the District of Columbia.

11. Byrd and Olander's discussions progressed to the point where they tentatively agreed to a framework for a deal consisting of the following major points:

a. Olander would help Wall Group obtain a $800,000 line of credit from Capital Bank by agreeing to personally guarantee the line of credit;

b. Olander's company, MDO, would take over some of Wall Group's "back office" administrative and business functions so that Byrd could focus on growing the business; and

c. Byrd would transfer to Olander a twenty-five percent ownership stake in Wall Group.

12. Before Olander agreed to go forward with the deal he required that Byrd provide him with Wall Group's financial statements so that Olander could evaluate the financial condition of the company. Capital Bank also required this information as a condition of it providing the line of credit to Wall Group.

13. Byrd provided Olander with documents he represented were the Wall Group's (i) income statement for 2013 and 2014, (ii) balance sheet for 2013 and 2014, (iii) income statement for 2015, and (iv) balance sheet for 2015 (collectively, the "Financial Statements").

14. Relying on the Financial Statements provided by Byrd, Olander decided to invest in Wall Group.

15. Upon information and belief, Capital Bank also relied on the Financial Statements which were provided by Byrd to Capital Bank and, based on that information, Capital Bank agreed to provide a line of credit to Wall Group.

16. Without the Financial Statements, Olander would not have agreed to invest in Wall Group. Moreover, absent Byrd's provision of the Financial Statements to Capital Bank, Capital Bank, upon information and belief, would not have agreed to extend a line of credit to Wall Group.

17. Byrd, Olander, and Wall Group formalized Olander's investment in a "Stock Purchase Agreement, Wall Group Industries, Inc." dated July 2015 (the "Stock Purchase Agreement"). Pursuant to the Stock Purchase Agreement, Olander became the owner of twenty-five percent of the capital stock of Wall Group.

18. Although not known by Olander at the time he entered into the Stock Purchase Agreement, the Financial Statements Byrd provided to induce Olander's investment were false and misleading.

19. For example:

a. The 2015 balance sheet showed that the Wall Group had more than $500,000 in cash as of July 16, 2015. The company's accounting records and bank statements from that time period do not substantiate this figure. Therefore the balance sheet was false and misleading.

b. The 2015 income sheet reflected roughly $650,000 in subcontractor cost of goods sold ("COGS") (i.e., expenses related to services provided by subcontractors). However, the company's accounting records indicate more than $1.1 million in subcontractor COGS. By reducing the COGS on the income sheet, Byrd made Wall Group appear to be substantially more profitable than it actually was. Therefore, the income sheet was false and misleading.

c. Byrd's inaccurate COGS figure meant that the company's net income was also overstated by more than $500,000. Therefore, the balance sheet was false and misleading.

20. The Stock Purchase Agreement, including Olander's agreement to personally guarantee Wall Group's $800,000 line of credit with Capital Bank and invest in Wall Group, was induced by Byrd's fraudulent misrepresentations.

Byrd Retains Control over Wall Group Management and Money

21. When Byrd and Olander first discussed Olander's investment in Wall Group, Byrd was receptive to transferring much of Wall Group's back office business and administrative functions to MDO.

22. However, after Olander's investment was finalized and Wall Group obtained the $800,000 line of credit from Capital Bank, Byrd refused to relinquish control of key Wall Group business functions to MDO.

23. In particular, Byrd excluded Olander and MDO from access, visibility, and control regarding Wall Group revenue intake. Byrd and Wall Group tightly controlled the billing functions of Wall Group and prevented Olander and MDO from corresponding directly with the accounting departments of the contractors for which Wall Group performed subcontracting work.

24. Byrd also secretly opened an additional Wall Group bank account at BB&T into which he deposited Wall Group funds, and refused to provide to MDO or Olander access to the Wall Group post office box.

25. As a result of Byrd's actions, Olander and MDO had to rely on Byrd for information regarding what revenue would be coming into Wall Group.

26. In contrast, Byrd shifted much of the responsibility to pay Wall Group's bills to MDO. As a result, MDO processed the checks to pay certain Wall Group expenses.

27. The eventual outcome of the arrangement was that Byrd had access to and control over the money coming into Wall Group, and relegated Olander and MDO to a bill-paying role.

Byrd Grossly Mismanages and Embezzles from Wall Group To Olander's Detriment

28. Byrd abused his control over Wall Group's revenue by grossly mismanaging the billing process on construction jobs and by embezzling company money for personal expenses.

29. In the construction industry, submitting a subcontractor's bills on a timely basis is critical to maintaining a company's cash flow and ensuring that bills are not rejected.

30. Byrd consistently failed to submit Wall Group invoices on a timely basis. This caused substantial delays in Wall Group's receiving of payments for completed work, hindered cash flow, resulted in non-payments, and forced Olander and MDO to make loans to Wall Group to allow the company to continue to operate.

31. In total, Olander and MDO loaned Wall Group hundreds of thousands of dollars on top of the $800,000 line of credit to Wall Group that Olander personally guaranteed. Approximately $520,000 of these loans remain outstanding.

32. Byrd's failure to timely submit invoices caused certain invoices, including invoices for substantial change orders, to be rejected by contractors. These failures cost Wall Group substantial revenue, which in turn contributed to Wall Group's inability to repay the Capital Bank line of credit and to repay the loans by Olander and MDO.

33. Olander and MDO also discovered that Byrd was embezzling Wall Group funds for personal purposes.

34. For example, in early 2017, Byrd opened an additional BB&T company account without informing Olander or MDO. At the same time, Byrd represented to Olander and MDO that he expected a number of significant payments to arrive imminently from completed jobs.

35. When the payments arrived, Byrd deposited them into the secret BB&T account, while continuing to represent to Olander and MDO that they had not yet been received and that the company needed additional cash infusions from Olander.

36. Wall Group bank account records show that Byrd used the hidden company funds to pay for countless personal expenses.

37. In April and May 2017 alone, Byrd used company funds to pay for meals and drinks at restaurants and bars, alcohol at an ABC store, two gym memberships, tutoring for his child, and other personal expenses. These were not legitimate company expenses.[1]

38. For example, on May 26, 2017, Byrd wrote two checks to "CASH," one for thirteen thousand dollars ($13,000) and one for ten thousand dollars ($10,000). On June 1, 2017, Byrd wrote another check to "CASH" for two thousand dollars ($2,000). That same day, Byrd wrote a thirty-six thousand dollar ($36,000) check to WDB Construction Services, a company owned by his mother, Diane Byrd. However, Byrd previously told Olander that Wall Group was not using WDB Construction Services for any services on behalf of Wall Group. Upon information and belief, at least a substantial portion of this sixty-one thousand dollars ($61,000) in withdrawals was for personal reasons and were not used for legitimate, Wall Group expenses.

39. Company bank records show numerous other checks written to "CASH," for tens of thousands of dollars, in addition to those detailed above. These records also show numerous company checks made out to Diane Byrd, Byrd's mother.

40. Byrd has consistently failed to provide complete documentation or explanation for these payments and withdrawals.

41. Byrd also used Wall Group funds to pay for personal expenses over the weekend of May 5-7, 2017 (and on numerous other occasions). Bank records reflect that between May 5th

[1] Byrd's use of Wall Group funds to pay for personal expenses is strikingly similar to the allegations made against Byrd by the Chapter 7 bankruptcy trustee of Tek Wall, Inc., a drywall construction company of which Byrd owned fifty percent. *See In re: Frankie Byrd*, Adversary Proceeding in Case No. 12-80360, Doc. 29, 3/13/12, ¶ 14 (alleging that Byrd used company funds for personal loans, trips, medical expenses, clothing, food, entertainment, legal fees, fuel and utilities, and other personal expenses). According to the trustee, Byrd signed a promissory note for $225,000, "given as consideration for settling claims against [Byrd] for breach of fiduciary duties, embezzlement and larceny of corporate assets belonging to Tek Wall, Inc." *See* Doc. 29-1.

and May 6th, Byrd used a Wall Group debit card to purchase several hundred dollars worth of goods at Nordstrom in Southpoint Mall.

42. Bank records similarly reflect that on Sunday, May 7th, Byrd charged the company account $190.00 for purchases at Cornerstone Tavern, a bar in Raleigh, and $31.95 at "Alchemy," a club in Raleigh. Later that night, Byrd was arrested and charged with driving while impaired and felony serious injury by vehicle.

43. During the same time period that Byrd depleted Wall Group funds to pay for his own personal expenses, Byrd also regularly demanded that Olander or MDO loan Wall Group additional funds to pay for operating costs that he claimed Wall Group could not cover.

44. As a result of Byrd's gross mismanagement and embezzlement of Wall Group funds, Wall Group has been unable to repay its loans to Olander and MDO, and has failed to repay its line of credit to Capital Bank, which Olander has personally guaranteed. Byrd's gross mismanagement and embezzlement of Wall Group funds has caused significant harm to Wall Group and has also caused separate and distinct harm to Olander and MDO.

Byrd Fraudulently Induces Additional Loans From Olander

45. In February and March 2017, Byrd asked Olander to loan Wall Group money to cover operating expenses.

46. Byrd represented to Olander that these loans would be repaid from the proceeds from a Davidson & Jones pay application (PA8105-14-103) for one hundred four thousand, sixty-two dollars and fifty cents ($104,062.50). On February 14, 2017 Byrd provided a copy of the pay application to Olander.

47. In reliance on Byrd's representation and the pay application, Olander loaned Wall Group approximately thirty-seven thousand dollars ($37,000), including a $25,000 loan on February 27, 2017 and a nearly $12,000 loan on March 10, 2017.

48. Olander later discovered that the real Davidson & Jones pay application was for only sixteen thousand, five hundred thirty dollars and thirty cents ($16,530.30).

49. Upon information and belief, Byrd created two pay applications: one genuine pay application for sixteen thousand, five hundred thirty dollars and thirty cents ($16,530.30) to send to Davidson & Jones, and a second fraudulent pay application for one hundred four thousand, sixty-two dollars and fifty cents ($104,062.50) to send to Olander to induce him to loan money to Wall Group.

## DERIVATIVE CLAIM STANDING

50. Olander has standing to bring a derivative claim for breach of fiduciary duty on behalf of Wall Group because Olander was a shareholder of Wall Group at the time of acts and omissions set forth below, and Olander will fairly and adequately represent the interests of Wall Group in enforcing the right of the corporation.

51. Olander made a written demand on Wall Group to take suitable action to address the issues set forth in this Complaint. A copy of the written demand is attached to this Complaint as Exhibit 1.

52. Olander did not wait ninety days after serving the demand before initiating this action because irreparable injury to Wall Group would result if Olander waited for the expiration of the ninety day period. As set forth in detail herein, Byrd's gross mismanagement and misuse of Wall Group assets is causing significant, on-going harm, which threatens the viability of Wall Group.

## FIRST CLAIM FOR RELIEF
## (FRAUD)

## (OLANDER INDIVIDUALLY AGAINST BYRD)

53. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

54. In or around mid-2015, Byrd falsely represented material facts to induce Olander to invest in Wall Group.

55. Byrd falsely represented material facts in the Financial Statements, including by understating the amount of cash held by Wall Group, understating the subcontractor expenses, and overstating Wall Group's net income, all as described in more detail above.

56. These representations were false, as detailed above.

57. Byrd's false representations were reasonably calculated to deceive Olander.

58. Byrd's false representations were intended to deceive Olander with the intent that Olander act upon them and enter into the Stock Purchase Agreement.

59. Olander was, in fact, deceived by Byrd's false statements and acted upon them by entering into the Stock Purchase Agreement.

60. Olander reasonably relied on the false statements by Byrd.

61. As a direct and proximate result of the false statements by Byrd, Olander has been damaged in an amount exceeding $100,000.

62. Byrd falsely represented a material facts in the Davidson & Jones pay application (PA8105-14-103) that he provided to Olander in that he falsely stated that the pay application was for one hundred four thousand, sixty-two dollars and fifty cents ($104,062.50), when the genuine pay application was only for sixteen thousand, five hundred thirty dollars and thirty cents ($16,530.30).

63. Byrd's false representation in the Davidson & Jones pay application that he provided to Olander was reasonably calculated to deceive Olander.

64. Byrd's false representation in the Davidson & Jones pay application that he provided to Olander was intended to deceive Olander with the intent that Olander act upon it and loan Wall Group additional funds.

65. Olander was, in fact, deceived by Byrd's false statement in the Davidson & Jones pay application that he provided to Olander and acted upon it by loaning Wall Group at least thirty seven thousand dollars ($37,000).

66. Olander reasonably relied on Byrd's false statement in the Davidson & Jones pay application that he provided to Olander.

67. As a direct and proximate result of the false statement by Byrd in the Davidson & Jones pay application that he provided to Olander, Olander has been damaged.

68. Olander is entitled to a judgment against Byrd in an amount, in excess of $100,000, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

**SECOND CLAIM FOR RELIEF**
**(BREACH OF FIDUCIARY DUTY)**

**(OLANDER INDIVIDUALLY AGAINST BYRD)**

69. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

70. Wall Group is a closely held company with only two owners.

71. Byrd is the majority shareholder of Wall Group and owns a seventy-five percent stake. Byrd effectively controls the business operations of Wall Group, including by controlling all incoming revenue.

72. Byrd is also the president and sole director of Wall Group.

73. Olander is the minority shareholder of Wall Group and owns a twenty-five percent stake. Olander lacks meaningful control over the business operations of Wall Group.

74. Byrd owed Olander a special duty by virtue of Byrd's status as the controlling, majority owner of Wall Group. Moreover, the facts and circumstances of this case support an individual claim by Olander against Byrd for breach of fiduciary duty because, among other

things: a derivative claim recovery would go to Wall Group, thus benefitting Byrd, the wrongdoer; an individual recovery by Wall Group would not prejudice creditors of Wall Group, as Olander and MDO are the largest creditors of Wall Group; there is no danger of multiple lawsuits because Byrd and Olander are the only shareholders of Wall Group; and the lack of a market for Wall Group stock combined with Olander personal guaranty of Wall Group's line of credit make it impractical for Olander to exit the company.

75. Byrd's misconduct also caused an injury to Olander that is distinct from the injury suffered by Wall Group. Olander personally guaranteed Wall Group's line of credit with Capital Bank and has make numerous substantial loans to the company to cover operating costs. Therefore, Byrd's waste of corporate funds and other wrongdoing has caused distinct harm to Olander.

76. As the majority owner, president, and sole director of Wall Group, Byrd owed Olander a fiduciary duty.

77. Byrd breached his fiduciary duty to Olander by, among other things, grossly mismanaging Wall Group business and embezzling Wall Group funds as is set forth herein.

78. As a direct and proximate result of Byrd's breaches of his fiduciary duties, Olander has been damaged. Olander's injury is distinct from that suffered by Wall Group generally because Olander personally guaranteed the company's line of credit from Capital Bank and has made significant loans to support the operation of the company.

79. Olander is entitled to a judgment against Byrd in an amount, in excess of $100,000, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

## THIRD CLAIM FOR RELIEF
## (BREACH OF FIDUCIARY DUTY)

## (OLANDER, DERIVATIVELY ON BEHALF OF WALL GROUP, AGAINST BYRD)

80. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

81. Olander is the minority shareholder of Wall Group and was a shareholder of Wall Group at the time of the acts complained of in this Complaint.

82. Olander fairly and adequately represents the interests of Wall Group in enforcing its rights.

83. Olander has made a written demand to Wall Group to take suitable action in regard to the matters set forth in this Complaint.

84. Wall Group will suffer irreparable harm if the matters set forth in this Complaint are not immediately remedied.

85. As the president, sole director, and majority owner of Wall Group, Byrd owes a fiduciary duty to Wall Group.

86. Byrd has breached his fiduciary duty to Wall Group by, among other things, grossly mismanaging Wall Group business, and embezzling Wall Group funds.

87. As a direct and proximate result of Byrd's breaches of his fiduciary duties, Wall Group has been damaged.

88. Wall Group is entitled to a judgment against Byrd in an amount, in excess of $100,000, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**(CIVIL EMBEZZLEMENT PURSUANT TO N.C.G.S. § 1-538.2)**

**(OLANDER, DERIVATIVELY ON BEHALF OF WALL GROUP, AGAINST BYRD)**

89. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

90. Olander is the minority shareholder of Wall Group and was a shareholder of Wall Group at the time of the acts complained of in this Complaint.

91. Olander fairly and adequately represents the interests of Wall Group in enforcing its rights.

92. Olander has made a written demand to Wall Group to take suitable action in regard to the matters set forth in this Complaint.

93. Wall Group will suffer irreparable harm if the matters set forth in this Complaint are not immediately remedied.

94. Byrd is the President, sole director, and majority owner of Wall Group and, as such, is also a fiduciary of Wall Group.

95. In Byrd's role as President of Wall Group, he routinely received and controlled Wall Group Money by virtue of his fiduciary relationship.

96. Byrd fraudulently misapplied Wall Group money that he received in his fiduciary capacity including, as is set forth above, using Wall Group funds to pay for meals and drinks at restaurants and bars, alcohol at an ABC store, two gym memberships, tutoring for his child, and other personal expenses.

97. As a direct and proximate result of Byrd's embezzlement of Wall Group funds, Wall Group has been damaged.

98. Wall Group is entitled to a judgment against Byrd in an amount, in excess of $100,000 and punitive damages, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

**FIFTH CLAIM FOR RELIEF**
**(BREACH OF LOAN AGREEMENT)**

**(OLANDER AGAINST WALL GROUP)**

99. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

100. From time to time, Olander has made loans to Wall Group.

101. Wall Group has failed to repay the loans, which are past due. The loans are in default.

102. Currently, the outstanding balance of Olander's loans to Wall Group is $91,000.

103. Olander is entitled to recover a judgment for the full amount of his overdue loans to Wall Group.

**SIXTH CLAIM FOR RELIEF**
**(BREACH OF LOAN AGREEMENT)**

**(MDO AGAINST WALL GROUP)**

104. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

105. From time to time, MDO has made loans to Wall Group.

106. Wall Group has failed to repay the loans, which are past due. The loans are in default.

107. Currently, the outstanding balance of MDO's loans to Wall Group is $420,118.09.

108. MDO is entitled to recover a judgment for the full amount of his overdue loans to Wall Group.

WHEREFORE, Plaintiffs request that this Court:

1. Enter Judgment in favor of Plaintiffs and against Defendants;

2. Award Plaintiffs damages in excess of $100,000 to be proved at trial;

3. Award Plaintiff Olander, derivatively on behalf of Wall Group, damages in excess of $100,000 to be proved at trial;

4. Award Plaintiffs' punitive damages pursuant to applicable law;

5. Award Plaintiffs pre-judgment interest at the highest rate allowed by law;

6. Award Plaintiffs post-judgment interest at the highest rate allowed by law from the date of judgment until such judgment is satisfied in full;

7. Award Plaintiffs their costs incurred in this action;

8. Award Plaintiffs their attorney's fees in this action pursuant to applicable law; and

9. Grant such other and further relief as this Honorable Court deems just and proper.

This the 13th day of July, 2017.

Matthew H. Mall
N.C. Bar No. 36914
Collier Marsh
N.C. State Bar No. 46228
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Telephone: 919-828-0564
Facsimile: 919-834-4564

*Attorneys for Plaintiffs Michael D. Olander, Jr. and MDO Holdings, LLC*

**STATE OF NORTH CAROLINA** **VERIFICATION**

**WAKE COUNTY**

The undersigned, Michael D. Olander, Jr., being first duly sworn, deposes and says that he is the Manager of MDO Holdings, LLC, the other plaintiff in this action; that as such he is authorized to make this oath and verification; that he has read the foregoing Verified Complaint and the same is true and correct of his own personal knowledge, except as to those allegations made upon information and belief, and as to those allegations he believes them to be true.

This the 13 day of July, 2017.

SIGNATURE

Wake County, North Carolina

Signed and sworn to before me this day by Michael D. Olander, Jr.

Date: 7/13/17

Official Signature of Notary Public

M. Kathryn Thompson Notary Public

(Official Seal)

My commission expires: 2/8/19

M KATHRYN THOMPSON
NOTARY PUBLIC
WAKE COUNTY, N.C.

# EXHIBIT

# 1

Parker Poe

**Matthew H. Mall**
*Partner*
Telephone: 919.835.4626
Direct Fax: 919.834.4564
matthewmall@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

July 13, 2017

**VIA FEDERAL EXPRESS**

Wall Group Industries
Registered Agent
2501 Blue Ridge Road
Suite 250
Raleigh, NC 27607-6346

Re: Written Shareholder Demand Pursuant to N.C. Gen. Stat. § 55-7-42

To: Wall Group Industries, Inc.,

This law firm represents Michael D. Olander, Jr. Mr. Olander is a shareholder of Wall Group Industries, Inc. This letter is a shareholder demand pursuant to N.C. Gen. Stat. § 55-7-42.

The enclosed Verified Complaint describes in detail the breaches of fiduciary duty and other wrongdoing by Frank Lee Byrd, the current president of Wall Group Industries, Inc., to the detriment of the company. As a shareholder of Wall Group Industries, Mr. Olander demands that the company take immediate and suitable action to prevent any further wrongs by Mr. Byrd and to obtain complete redress from Mr. Byrd for the damage he has already caused. In particular, Mr. Olander demands that the company (1) require Mr. Byrd immediately to repay all Wall Group monies used by Mr. Byrd for non-company purposes; (2) require Mr. Byrd immediately to compensate Wall Group for all losses resulting from Mr. Byrd's failure to submit timely invoices for company jobs; and (3) take suitable action to prevent Mr. Byrd from further damaging the company.

Irreparable injury to Wall Group Industries, Inc. will result if Mr. Olander waits any longer before filing the Verified Complaint with the Court. Therefore, pursuant to N.C. Gen. Stat. § 55-7-42(2), Mr. Olander will file the Verified Complaint without waiting for the expiration of the 90-day period after sending this letter.

PPAB 3801566v1

Sincerely,

Matthew H. Mall

Enclosure

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17-CVS-

MICHAEL D. OLANDER, JR., individually and derivatively on behalf of Wall Group Industries, Inc., and MDO HOLDINGS, LLC,

Plaintiffs,

v.

FRANK LEE BYRD and WALL GROUP INDUSTRIES, INC.,

Defendants.

**VERIFIED COMPLAINT**

Plaintiffs Michael D. Olander, Jr. and MDO Holdings, LLC complain of Defendants Frank Lee Byrd and Wall Group Industries, Inc. as follows:

**NATURE OF CASE**

1. Plaintiff Michael D. Olander, Jr. is a minority shareholder in Wall Group Industries, Inc. Defendant Frank Lee Byrd is the controlling majority owner, sole director, and president of Wall Group Industries, Inc. Byrd breached his fiduciary duties to Olander and Wall Group; embezzled company funds for personal use; and engaged in significant fraud and wrongdoing to Olander and his management company, Plaintiff MDO Holdings, Inc. This action seeks to redress Byrd's wrongdoing.

**PARTIES & JURISDICTION**

2. Plaintiff Michael D. Olander, Jr. ("Olander") is an individual who resides in Wake County, North Carolina. Olander is an entrepreneur and is a member of Plaintiff MDO Holdings, LLC.

3. Plaintiff MDO Holdings, LLC ("MDO") is a limited liability company organized and existing under North Carolina law. MDO is registered to do business in North Carolina and has its principal place of business in Wake County, North Carolina.

4. Defendant Frank Lee Byrd ("Byrd") is an individual who resides in Durham County, North Carolina. Byrd is the majority owner, president, and sole director of Defendant Wall Group Industries, Inc.

5. Defendant Wall Group Industries, Inc. ("Wall Group") is a corporation organized and existing under North Carolina law. Wall Group is registered to do business in North Carolina and has its registered address in Wake County, North Carolina.

6. This Court has jurisdiction over the parties pursuant to N.C. Gen. Stat. § 1-75.4 and other applicable statutes.

7. Venue is proper pursuant to N.C. Gen. Stat. § 1-82 and other applicable statutes.

## RELEVANT FACTS

### Byrd Solicits Olander to Invest in Wall Group

8. Wall Group is a construction company that focuses on the construction and installation of specialty drywall. Byrd is the founder, president, and sole director of Wall Group. Until mid-2015, Byrd owned one hundred percent of Wall Group's stock.

9. In mid-2015, Byrd and Olander were introduced through a mutual acquaintance. Byrd was looking for an investor in Wall Group to help it grow.

10. Byrd discussed Wall Group and its financial condition with Olander. Byrd represented that Wall Group was profitable and had significant growth potential, including in connection with a number of federal government projects in the District of Columbia.

11. Byrd and Olander's discussions progressed to the point where they tentatively agreed to a framework for a deal consisting of the following major points:

a. Olander would help Wall Group obtain a $800,000 line of credit from Capital Bank by agreeing to personally guarantee the line of credit;

b. Olander's company, MDO, would take over some of Wall Group's "back office" administrative and business functions so that Byrd could focus on growing the business; and

c. Byrd would transfer to Olander a twenty-five percent ownership stake in Wall Group.

12. Before Olander agreed to go forward with the deal he required that Byrd provide him with Wall Group's financial statements so that Olander could evaluate the financial condition of the company. Capital Bank also required this information as a condition of it providing the line of credit to Wall Group.

13. Byrd provided Olander with documents he represented were the Wall Group's (i) income statement for 2013 and 2014, (ii) balance sheet for 2013 and 2014, (iii) income statement for 2015, and (iv) balance sheet for 2015 (collectively, the "Financial Statements").

14. Relying on the Financial Statements provided by Byrd, Olander decided to invest in Wall Group.

15. Upon information and belief, Capital Bank also relied on the Financial Statements which were provided by Byrd to Capital Bank and, based on that information, Capital Bank agreed to provide a line of credit to Wall Group.

16. Without the Financial Statements, Olander would not have agreed to invest in Wall Group. Moreover, absent Byrd's provision of the Financial Statements to Capital Bank, Capital Bank, upon information and belief, would not have agreed to extend a line of credit to Wall Group.

17. Byrd, Olander, and Wall Group formalized Olander's investment in a "Stock Purchase Agreement, Wall Group Industries, Inc." dated July 2015 (the "Stock Purchase Agreement"). Pursuant to the Stock Purchase Agreement, Olander became the owner of twenty-five percent of the capital stock of Wall Group.

18. Although not known by Olander at the time he entered into the Stock Purchase Agreement, the Financial Statements Byrd provided to induce Olander's investment were false and misleading.

19. For example:

a. The 2015 balance sheet showed that the Wall Group had more than $500,000 in cash as of July 16, 2015. The company's accounting records and bank statements from that time period do not substantiate this figure. Therefore the balance sheet was false and misleading.

b. The 2015 income sheet reflected roughly $650,000 in subcontractor cost of goods sold ("COGS") (i.e., expenses related to services provided by subcontractors). However, the company's accounting records indicate more than $1.1 million in subcontractor COGS. By reducing the COGS on the income sheet, Byrd made Wall Group appear to be substantially more profitable than it actually was. Therefore, the income sheet was false and misleading.

c. Byrd's inaccurate COGS figure meant that the company's net income was also overstated by more than $500,000. Therefore, the balance sheet was false and misleading.

20. The Stock Purchase Agreement, including Olander's agreement to personally guarantee Wall Group's $800,000 line of credit with Capital Bank and invest in Wall Group, was induced by Byrd's fraudulent misrepresentations.

Byrd Retains Control over Wall Group Management and Money

21. When Byrd and Olander first discussed Olander's investment in Wall Group, Byrd was receptive to transferring much of Wall Group's back office business and administrative functions to MDO.

22. However, after Olander's investment was finalized and Wall Group obtained the $800,000 line of credit from Capital Bank, Byrd refused to relinquish control of key Wall Group business functions to MDO.

23. In particular, Byrd excluded Olander and MDO from access, visibility, and control regarding Wall Group revenue intake. Byrd and Wall Group tightly controlled the billing functions of Wall Group and prevented Olander and MDO from corresponding directly with the accounting departments of the contractors for which Wall Group performed subcontracting work.

24. Byrd also secretly opened an additional Wall Group bank account at BB&T into which he deposited Wall Group funds, and refused to provide to MDO or Olander access to the Wall Group post office box.

25. As a result of Byrd's actions, Olander and MDO had to rely on Byrd for information regarding what revenue would be coming into Wall Group.

26. In contrast, Byrd shifted much of the responsibility to pay Wall Group's bills to MDO. As a result, MDO processed the checks to pay certain Wall Group expenses.

27. The eventual outcome of the arrangement was that Byrd had access to and control over the money coming into Wall Group, and relegated Olander and MDO to a bill-paying role.

Byrd Grossly Mismanages and Embezzles from Wall Group To Olander's Detriment

28. Byrd abused his control over Wall Group's revenue by grossly mismanaging the billing process on construction jobs and by embezzling company money for personal expenses.

29. In the construction industry, submitting a subcontractor's bills on a timely basis is critical to maintaining a company's cash flow and ensuring that bills are not rejected.

30. Byrd consistently failed to submit Wall Group invoices on a timely basis. This caused substantial delays in Wall Group's receiving of payments for completed work, hindered cash flow, resulted in non-payments, and forced Olander and MDO to make loans to Wall Group to allow the company to continue to operate.

31. In total, Olander and MDO loaned Wall Group hundreds of thousands of dollars on top of the $800,000 line of credit to Wall Group that Olander personally guaranteed. Approximately $520,000 of these loans remain outstanding.

32. Byrd's failure to timely submit invoices caused certain invoices, including invoices for substantial change orders, to be rejected by contractors. These failures cost Wall Group substantial revenue, which in turn contributed to Wall Group's inability to repay the Capital Bank line of credit and to repay the loans by Olander and MDO.

33. Olander and MDO also discovered that Byrd was embezzling Wall Group funds for personal purposes.

34. For example, in early 2017, Byrd opened an additional BB&T company account without informing Olander or MDO. At the same time, Byrd represented to Olander and MDO that he expected a number of significant payments to arrive imminently from completed jobs.

35. When the payments arrived, Byrd deposited them into the secret BB&T account, while continuing to represent to Olander and MDO that they had not yet been received and that the company needed additional cash infusions from Olander.

36. Wall Group bank account records show that Byrd used the hidden company funds to pay for countless personal expenses.

37. In April and May 2017 alone, Byrd used company funds to pay for meals and drinks at restaurants and bars, alcohol at an ABC store, two gym memberships, tutoring for his child, and other personal expenses. These were not legitimate company expenses.[1]

38. For example, on May 26, 2017, Byrd wrote two checks to "CASH," one for thirteen thousand dollars ($13,000) and one for ten thousand dollars ($10,000). On June 1, 2017, Byrd wrote another check to "CASH" for two thousand dollars ($2,000). That same day, Byrd wrote a thirty-six thousand dollar ($36,000) check to WDB Construction Services, a company owned by his mother, Diane Byrd. However, Byrd previously told Olander that Wall Group was not using WDB Construction Services for any services on behalf of Wall Group. Upon information and belief, at least a substantial portion of this sixty-one thousand dollars ($61,000) in withdrawals was for personal reasons and were not used for legitimate, Wall Group expenses.

39. Company bank records show numerous other checks written to "CASH," for tens of thousands of dollars, in addition to those detailed above. These records also show numerous company checks made out to Diane Byrd, Byrd's mother.

40. Byrd has consistently failed to provide complete documentation or explanation for these payments and withdrawals.

41. Byrd also used Wall Group funds to pay for personal expenses over the weekend of May 5-7, 2017 (and on numerous other occasions). Bank records reflect that between May 5th

[1] Byrd's use of Wall Group funds to pay for personal expenses is strikingly similar to the allegations made against Byrd by the Chapter 7 bankruptcy trustee of Tek Wall, Inc., a drywall construction company of which Byrd owned fifty percent. *See In re: Frankie Byrd*, Adversary Proceeding in Case No. 12-80360, Doc. 29, 3/13/12, ¶ 14 (alleging that Byrd used company funds for personal loans, trips, medical expenses, clothing, food, entertainment, legal fees, fuel and utilities, and other personal expenses). According to the trustee, Byrd signed a promissory note for $225,000, "given as consideration for settling claims against [Byrd] for breach of fiduciary duties, embezzlement and larceny of corporate assets belonging to Tek Wall, Inc." *See* Doc. 29-1.

and May 6th, Byrd used a Wall Group debit card to purchase several hundred dollars worth of goods at Nordstrom in Southpoint Mall.

42. Bank records similarly reflect that on Sunday, May 7th, Byrd charged the company account $190.00 for purchases at Cornerstone Tavern, a bar in Raleigh, and $31.95 at "Alchemy," a club in Raleigh. Later that night, Byrd was arrested and charged with driving while impaired and felony serious injury by vehicle.

43. During the same time period that Byrd depleted Wall Group funds to pay for his own personal expenses, Byrd also regularly demanded that Olander or MDO loan Wall Group additional funds to pay for operating costs that he claimed Wall Group could not cover.

44. As a result of Byrd's gross mismanagement and embezzlement of Wall Group funds, Wall Group has been unable to repay its loans to Olander and MDO, and has failed to repay its line of credit to Capital Bank, which Olander has personally guaranteed. Byrd's gross mismanagement and embezzlement of Wall Group funds has caused significant harm to Wall Group and has also caused separate and distinct harm to Olander and MDO.

<u>Byrd Fraudulently Induces Additional Loans From Olander</u>

45. In February and March 2017, Byrd asked Olander to loan Wall Group money to cover operating expenses.

46. Byrd represented to Olander that these loans would be repaid from the proceeds from a Davidson & Jones pay application (PA8105-14-103) for one hundred four thousand, sixty-two dollars and fifty cents ($104,062.50). On February 14, 2017 Byrd provided a copy of the pay application to Olander.

47. In reliance on Byrd's representation and the pay application, Olander loaned Wall Group approximately thirty-seven thousand dollars ($37,000), including a $25,000 loan on February 27, 2017 and a nearly $12,000 loan on March 10, 2017.

48. Olander later discovered that the real Davidson & Jones pay application was for only sixteen thousand, five hundred thirty dollars and thirty cents ($16,530.30).

49. Upon information and belief, Byrd created two pay applications: one genuine pay application for sixteen thousand, five hundred thirty dollars and thirty cents ($16,530.30) to send to Davidson & Jones, and a second fraudulent pay application for one hundred four thousand, sixty-two dollars and fifty cents ($104,062.50) to send to Olander to induce him to loan money to Wall Group.

## DERIVATIVE CLAIM STANDING

50. Olander has standing to bring a derivative claim for breach of fiduciary duty on behalf of Wall Group because Olander was a shareholder of Wall Group at the time of acts and omissions set forth below, and Olander will fairly and adequately represent the interests of Wall Group in enforcing the right of the corporation.

51. Olander made a written demand on Wall Group to take suitable action to address the issues set forth in this Complaint. A copy of the written demand is attached to this Complaint as Exhibit 1.

52. Olander did not wait ninety days after serving the demand before initiating this action because irreparable injury to Wall Group would result if Olander waited for the expiration of the ninety day period. As set forth in detail herein, Byrd's gross mismanagement and misuse of Wall Group assets is causing significant, on-going harm, which threatens the viability of Wall Group.

## FIRST CLAIM FOR RELIEF
## (FRAUD)

## (OLANDER INDIVIDUALLY AGAINST BYRD)

53. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

54. In or around mid-2015, Byrd falsely represented material facts to induce Olander to invest in Wall Group.

55. Byrd falsely represented material facts in the Financial Statements, including by understating the amount of cash held by Wall Group, understating the subcontractor expenses, and overstating Wall Group's net income, all as described in more detail above.

56. These representations were false, as detailed above.

57. Byrd's false representations were reasonably calculated to deceive Olander.

58. Byrd's false representations were intended to deceive Olander with the intent that Olander act upon them and enter into the Stock Purchase Agreement.

59. Olander was, in fact, deceived by Byrd's false statements and acted upon them by entering into the Stock Purchase Agreement.

60. Olander reasonably relied on the false statements by Byrd.

61. As a direct and proximate result of the false statements by Byrd, Olander has been damaged in an amount exceeding $100,000.

62. Byrd falsely represented a material facts in the Davidson & Jones pay application (PA8105-14-103) that he provided to Olander in that he falsely stated that the pay application was for one hundred four thousand, sixty-two dollars and fifty cents ($104,062.50), when the genuine pay application was only for sixteen thousand, five hundred thirty dollars and thirty cents ($16,530.30).

63. Byrd's false representation in the Davidson & Jones pay application that he provided to Olander was reasonably calculated to deceive Olander.

64. Byrd's false representation in the Davidson & Jones pay application that he provided to Olander was intended to deceive Olander with the intent that Olander act upon it and loan Wall Group additional funds.

65. Olander was, in fact, deceived by Byrd's false statement in the Davidson & Jones pay application that he provided to Olander and acted upon it by loaning Wall Group at least thirty seven thousand dollars ($37,000).

66. Olander reasonably relied on Byrd's false statement in the Davidson & Jones pay application that he provided to Olander.

67. As a direct and proximate result of the false statement by Byrd in the Davidson & Jones pay application that he provided to Olander, Olander has been damaged.

68. Olander is entitled to a judgment against Byrd in an amount, in excess of $100,000, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

**<u>SECOND CLAIM FOR RELIEF</u>**
**(BREACH OF FIDUCIARY DUTY)**

**(OLANDER INDIVIDUALLY AGAINST BYRD)**

69. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

70. Wall Group is a closely held company with only two owners.

71. Byrd is the majority shareholder of Wall Group and owns a seventy-five percent stake. Byrd effectively controls the business operations of Wall Group, including by controlling all incoming revenue.

72. Byrd is also the president and sole director of Wall Group.

73. Olander is the minority shareholder of Wall Group and owns a twenty-five percent stake. Olander lacks meaningful control over the business operations of Wall Group.

74. Byrd owed Olander a special duty by virtue of Byrd's status as the controlling, majority owner of Wall Group. Moreover, the facts and circumstances of this case support an individual claim by Olander against Byrd for breach of fiduciary duty because, among other

things: a derivative claim recovery would go to Wall Group, thus benefitting Byrd, the wrongdoer; an individual recovery by Wall Group would not prejudice creditors of Wall Group, as Olander and MDO are the largest creditors of Wall Group; there is no danger of multiple lawsuits because Byrd and Olander are the only shareholders of Wall Group; and the lack of a market for Wall Group stock combined with Olander personal guaranty of Wall Group's line of credit make it impractical for Olander to exit the company.

75. Byrd's misconduct also caused an injury to Olander that is distinct from the injury suffered by Wall Group. Olander personally guaranteed Wall Group's line of credit with Capital Bank and has make numerous substantial loans to the company to cover operating costs. Therefore, Byrd's waste of corporate funds and other wrongdoing has caused distinct harm to Olander.

76. As the majority owner, president, and sole director of Wall Group, Byrd owed Olander a fiduciary duty.

77. Byrd breached his fiduciary duty to Olander by, among other things, grossly mismanaging Wall Group business and embezzling Wall Group funds as is set forth herein.

78. As a direct and proximate result of Byrd's breaches of his fiduciary duties, Olander has been damaged. Olander's injury is distinct from that suffered by Wall Group generally because Olander personally guaranteed the company's line of credit from Capital Bank and has made significant loans to support the operation of the company.

79. Olander is entitled to a judgment against Byrd in an amount, in excess of $100,000, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

**THIRD CLAIM FOR RELIEF**
**(BREACH OF FIDUCIARY DUTY)**

**(OLANDER, DERIVATIVELY ON BEHALF OF WALL GROUP, AGAINST BYRD)**

80. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

81. Olander is the minority shareholder of Wall Group and was a shareholder of Wall Group at the time of the acts complained of in this Complaint.

82. Olander fairly and adequately represents the interests of Wall Group in enforcing its rights.

83. Olander has made a written demand to Wall Group to take suitable action in regard to the matters set forth in this Complaint.

84. Wall Group will suffer irreparable harm if the matters set forth in this Complaint are not immediately remedied.

85. As the president, sole director, and majority owner of Wall Group, Byrd owes a fiduciary duty to Wall Group.

86. Byrd has breached his fiduciary duty to Wall Group by, among other things, grossly mismanaging Wall Group business, and embezzling Wall Group funds.

87. As a direct and proximate result of Byrd's breaches of his fiduciary duties, Wall Group has been damaged.

88. Wall Group is entitled to a judgment against Byrd in an amount, in excess of $100,000, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**(CIVIL EMBEZZLEMENT PURSUANT TO N.C.G.S. § 1-538.2)**

**(OLANDER, DERIVATIVELY ON BEHALF OF WALL GROUP, AGAINST BYRD)**

89. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

90. Olander is the minority shareholder of Wall Group and was a shareholder of Wall Group at the time of the acts complained of in this Complaint.

91. Olander fairly and adequately represents the interests of Wall Group in enforcing its rights.

92. Olander has made a written demand to Wall Group to take suitable action in regard to the matters set forth in this Complaint.

93. Wall Group will suffer irreparable harm if the matters set forth in this Complaint are not immediately remedied.

94. Byrd is the President, sole director, and majority owner of Wall Group and, as such, is also a fiduciary of Wall Group.

95. In Byrd's role as President of Wall Group, he routinely received and controlled Wall Group Money by virtue of his fiduciary relationship.

96. Byrd fraudulently misapplied Wall Group money that he received in his fiduciary capacity including, as is set forth above, using Wall Group funds to pay for meals and drinks at restaurants and bars, alcohol at an ABC store, two gym memberships, tutoring for his child, and other personal expenses.

97. As a direct and proximate result of Byrd's embezzlement of Wall Group funds, Wall Group has been damaged.

98. Wall Group is entitled to a judgment against Byrd in an amount, in excess of $100,000 and punitive damages, to be proven at trial, plus pre-judgment and post-judgment interest, costs, and attorneys' fees as permitted by law.

## FIFTH CLAIM FOR RELIEF
## (BREACH OF LOAN AGREEMENT)

## (OLANDER AGAINST WALL GROUP)

99. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

100. From time to time, Olander has made loans to Wall Group.

101. Wall Group has failed to repay the loans, which are past due. The loans are in default.

102. Currently, the outstanding balance of Olander's loans to Wall Group is $91,000.

103. Olander is entitled to recover a judgment for the full amount of his overdue loans to Wall Group.

## SIXTH CLAIM FOR RELIEF
## (BREACH OF LOAN AGREEMENT)

## (MDO AGAINST WALL GROUP)

104. Plaintiffs reallege and incorporate herein the preceding allegations of the Complaint.

105. From time to time, MDO has made loans to Wall Group.

106. Wall Group has failed to repay the loans, which are past due. The loans are in default.

107. Currently, the outstanding balance of MDO's loans to Wall Group is $420,118.09.

108. MDO is entitled to recover a judgment for the full amount of his overdue loans to Wall Group.

WHEREFORE, Plaintiffs request that this Court:

1. Enter Judgment in favor of Plaintiffs and against Defendants;

2. Award Plaintiffs damages in excess of $100,000 to be proved at trial;

3. Award Plaintiff Olander, derivatively on behalf of Wall Group, damages in excess of $100,000 to be proved at trial;

4. Award Plaintiffs' punitive damages pursuant to applicable law;

5. Award Plaintiffs pre-judgment interest at the highest rate allowed by law;

6. Award Plaintiffs post-judgment interest at the highest rate allowed by law from the date of judgment until such judgment is satisfied in full;

7. Award Plaintiffs their costs incurred in this action;

8. Award Plaintiffs their attorney's fees in this action pursuant to applicable law; and

9. Grant such other and further relief as this Honorable Court deems just and proper.

This the 13th day of July 2017.

Matthew H. Mall
N.C. Bar No. 36914
Collier Marsh
N.C. State Bar No. 46228
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Telephone: 919-828-0564
Facsimile: 919-834-4564

*Attorneys for Plaintiffs Michael D. Olander, Jr. and MDO Holdings, LLC*

**STATE OF NORTH CAROLINA** **VERIFICATION**

**WAKE COUNTY**

The undersigned, Michael D. Olander, Jr., being first duly sworn, deposes and says that he is the individual plaintiff and is the Manager of MDO Holdings, LLC, the other plaintiff in this action; that as such he is authorized to make this oath and verification; that he has read the foregoing Verified Complaint and the same is true and correct of his own personal knowledge, except as to those allegations made upon information and belief, and as to those allegations he believes them to be true.

This the 13 day of July, 2017.

SIGNATURE

Wake County, North Carolina

Signed and sworn to before me this day by Michael D. Olander, Jr.

Date: 7/13/17

Official Signature of Notary Public

M. Kathryn Thompson Notary Public

My commission expires: 2/8/19

(Official Seal)

M KATHRYN THOMPSON
NOTARY PUBLIC
WAKE COUNTY, N.C.